OPINION
{¶ 1} This is an appeal by appellant, Terry Thomas, from a judgment of the Franklin County Court of Common Pleas, affirming an order by appellee, Ohio State Racing Commission ("commission"), finding appellant in violation of the commission's horse racing rules after appellant's horse tested for a level of total carbon dioxide in excess of the threshold amount of 37 millimoles per liter, as set forth in Ohio Adm. Code 3769-18-01.
 {¶ 2} Appellant is licensed by the commission as a trainer. On September 7, 2006, "Country Welcome," a horse owned and trained by appellant, finished first in a race *Page 2 
at Scioto Downs. Prior to the race, the commission's veterinarian drew blood from Country Welcome, and on September 27, 2006, the commission's laboratory determined that the horse tested at 38.4 millimoles of total carbon dioxide ("TCO2") per liter of blood serum. Appellant was informed of the violation approximately 33 days after the race. Although appellant could have quarantined Country Welcome for the purpose of determining his natural TCO2 level, pursuant to Ohio Adm. Code 769-18-01(B)(19)(a), appellant allowed Country Welcome to be claimed.
 {¶ 3} Based upon the laboratory report, the judges at Scioto Downs issued a ruling finding appellant in violation of the commission's medication rules. Appellant challenged the ruling, and the matter came for hearing before a commission hearing examiner. Following the presentation of evidence, the hearing examiner issued a report and recommendation finding that the commission proved, by a preponderance of the evidence, appellant had violated provisions of Ohio Adm. Code 769-18-01 and 3769-18-02.
 {¶ 4} Following objections filed by appellant, the commission issued an order adopting the findings of fact and conclusions of law of the hearing examiner, and suspending appellant's license for a period of one year, commencing August 7, 2007. The commission also imposed a fine of $1,000, and assessed the hearing expenses and costs against appellant.
 {¶ 5} Appellant appealed the commission's decision to the trial court, and the parties submitted briefs to the court. By decision and judgment rendered August 13, 2008, the trial court affirmed the commission's order, finding that such order was *Page 3 
supported by reliable, probative, and substantial evidence and was in accordance with law.
 {¶ 6} On appeal, appellant sets forth the following two assignments of error for this court's review:
 Assignment of Error Number One
 The lower court erred and abused its discretion by concluding that the Appellee's Decision was supported by reliable, probative and substantial evidence.
 Assignment of Error Number Two
 The lower court erred in affirming the penalties imposed by the Appellee as the same denied Appellant equal protection of law and were not supported by the evidence.
 {¶ 7} Under the first assignment of error, appellant argues that the trial court abused its discretion by concluding that the commission's order was supported by reliable, probative, and substantial evidence. Within this assignment of error, appellant raises several sub-arguments: (1) there was no evidence presented at the hearing that TCO2 will enhance a horse's performance or that the betting public is injured by a horse that races with a TCO2 level above 37 millimoles per liter; (2) there was evidence presented at the hearing that any number of factors could affect the TCO2 level of a horse, including the time of day, climate, temperature, diet, and exercise; (3) the proceedings before the commission were quasi-criminal in nature, and, thus, the commission failed to establish that the blood sample taken from Country Welcome was properly stored and tested, nor was there any evidence that established the machines used for testing were properly calibrated; (4) trainers, such as appellant, are deprived of due process because there is no independent means to test a horse prior to the start of a *Page 4 
race for excess levels of TCO2; (5) Ohio Adm. Code 3769-18-01 exceeds the commission's rule-making authority because TCO2 is not a foreign substance; (6) because TCO2 is a substance that a horse naturally produces, there is no rational basis for its inclusion as a prohibited foreign substance as set forth in Ohio Adm. Code 3769-18-01; and (7) there was no evidence presented at the hearing that appellant did any act to cause an elevation of Country Welcome's TCO2 level.
 {¶ 8} Under R.C. 119.12, when a common pleas court reviews an order of an administrative agency, the court must consider the entire record to determine whether the agency's order is supported by reliable, probative, and substantial evidence and is in accordance with law.Univ. of Cincinnati v. Conrad (1980), 63 Ohio St.2d 108, 110-11. By contrast, an appellate court's review is more limited. Provisions Plus,Inc. v. Ohio Liquor Control Comm., 10th Dist. No. 03AP-670,2004-Ohio-592, ¶ 8, citing Pons v. Ohio State Med. Bd. (1993),66 Ohio St.3d 619, 1993-Ohio-122. The appellate court determines whether the trial court abused its discretion. Id. Absent an abuse of discretion, the appellate court may not substitute its judgment for that of the administrative agency or the common pleas court. Id. An appellate court, however, has plenary review of purely legal questions. Id.
 {¶ 9} At this juncture, we note that several of the sub-arguments advanced by appellant were recently rejected in Thomas v. Ohio StateRacing Comm., 10th Dist. No. 08AP-459, 2008-Ohio-6965 (Thomas I"), a case involving the same parties and allegations, but concerned Country Welcome's TCO2 level as tested prior to his race on March 22, 2006, at Northfield Park. Upon review, we find Thomas I to be dispositive of appellant's first, second, and fourth sub-arguments, as set forth above. Additionally, the *Page 5 
court in Thomas I was not persuaded by appellant's characterization of the proceedings before the commission as being quasi-criminal, and we agree with the court's rejection of that argument. Accordingly, our discussion shall focus on the issues raised by appellant's remaining sub-arguments, all of which form the basis to support his general argument that the commission's order was not supported by reliable, probative, and substantial evidence.
 {¶ 10} We begin by noting that the commission found appellant to be the trainer of the horse, and, therefore, he was the absolute insurer of the condition of Country Welcome under Ohio Adm. Code 3769-18-02. The commission also found appellant was in violation of Ohio Adm. Code 769-18-01 (B)(4)(d), which provides for a violation "[s]hould a test sample of blood taken from a horse show a concentration of total carbon dioxide in the plasma and/or serum in excess of thirty-seven millimoles per liter."
 {¶ 11} Ohio Adm. Code 3769-18-02 is "commonly known as the absolute insurer rule." Belcher v. Ohio State Racing Comm., 10th Dist. No. 02AP-998, 2003-Ohio-2187, ¶ 14. That rule "imposes strict liability on the trainer for the presence of drugs in a horse." Id. at ¶ 16. Ohio Adm. Code 3769-18-02(A) states, in relevant part:
 The trainer shall be the absolute insurer of, and responsible for, the condition of the horse entered in a race, regardless of the acts of third parties. Should the chemical or other analysis of urine or blood specimens prove positive, showing the presence of any foreign substance not permitted by rule 3769-18-01 of the Administrative Code, the trainer of the horse * * * and any other person shown to have had the care or attendance of the horse may, in the discretion of the commission, be subjected to penalties provided in paragraph (B) of this rule.
 {¶ 12} The Ohio Supreme Court has observed that horse racing is one of those fields "subject to extraordinarily broad regulatory powers."O'Daniel v. Ohio State Racing *Page 6 Comm. (1974), 37 Ohio St.2d 87, 93. Further, the Supreme Court has rejected constitutional challenges to the absolute insurer rule. Id. (holding that the rule, "which imposes strict accountability upon a trainer for the condition of the horse he enters in a race, is not unconstitutional, void or beyond the scope of authority granted the commission by the general assembly").
 {¶ 13} In the present case, appellant testified on his own behalf, and denied ever giving Country Welcome a "milkshake,"[1] or doing anything to purposely raise the TCO2 level of the horse. Whether or not appellant did anything to cause an elevation of Country Welcome's TCO2 level is irrelevant; the absolute insurer rule imposes strict liability on the trainer for a TCO2 level in excess of 37 millimoles per liter, and the only evidence necessary to support a violation of this rule is a test result over that amount.
 {¶ 14} We are also not persuaded by appellant's argument that the commission exceeded its rule-making authority. Ohio Adm. Code 769-18-01(A)(2) allows the commission to establish methods and detection levels for prohibited foreign substances. That provision defines a foreign substance as "all classified substances except those which exist naturally in the untreated horse at normal physiologicalconcentrations." (Emphasis added.) Given that the commission has deemed an abnormal physiological concentration of TCO2 is one that exceeds 37 millimoles per liter, Ohio Adm. Code 3769-18-02(B)(4), *Page 7 
a concentration which exceeds that threshold would then constitute a foreign substance as defined in Ohio Adm. Code 3769-18-01(A)(2).[2]
 {¶ 15} The reason for treating a level of TCO2 above 37 millimoles per liter as a foreign substance is due to the belief that an increased level of TCO2, prior to a race, could enhance the horse's performance. During the hearing, Dr. Richard Sams, a professor at the University of Florida, Director of the Florida Racing Commission's testing laboratory, and technical advisor to the Ohio State University Analytical Toxicology Laboratory, testified that:
 [T]here has been concern in the racing industry about the administration of substances that cause an elevation of the total CO2. It is believed that an elevated concentration of TCO2 results in a delay in the onset of fatigue during exercise.
 It's believed that that occurs as a result of an increase in the rate at which lactic acid is removed from intracellular sites. And it's the accumulation of lactic acid inside cells that causes fatigue.
(Hearing Tr. 53.)
 {¶ 16} The enabling legislation regarding horse racing is found in R.C. Chapter 3769. R.C. 3769.02 establishes the commission, while R.C. 3769.03 empowers the commission to "prescribe the rules and conditions under which horse racing may be conducted." Under the authority granted by R.C. 3769.03, the commission adopted Ohio Adm. Code 3769-18-01(A)(2) and 3769-18-02(B)(4). "Horse racing and legalized wagering thereon, are subjects with respect to which police regulations for the protection of the public safety, morals, and general welfare, are not only proper but are an absolute *Page 8 
necessity." Standard "Tote," Inc. v. Ohio State Racing Comm. (1954), 121 N.E.2d 463, 469. Indeed, the very nature of horse racing itself presents numerous opportunities for abuse. Specific and strict rules are necessary in order to preserve the integrity of the sport. Haehn v. OhioState Racing Comm. (1992), 83 Ohio App.3d 208, 213. Accordingly, we find that a rational basis exists between the foregoing considerations and the commission's regulation that treats a TCO2 level above 37 millimoles per liter as a foreign substance.
 {¶ 17} Appellant also takes issue with the testing of the sample taken from Country Welcome. Specifically, appellant challenges the quality control measures regarding the collection and handling of the sample, as well as the machine that performed the testing. As relevant to our discussion, the commission, during the administrative hearing, presented the testimony of Dr. Helen Cole, the state veterinarian at Scioto Downs racetrack, and Dr. Richard Sams. Dr. Cole testified regarding the standard operating procedure for pre-race collection of blood samples, storage of blood samples, and the shipment of blood samples to the laboratory. Dr. Cole, who was working at Scioto Downs on September 7, 2006, testified that she followed all standard operating procedures when collecting blood samples from horses on that date. The hearing examiner determined that Dr. Cole was competent to testify as to the collection process of samples in this matter.
 {¶ 18} Dr. Sams testified that he has been involved in the testing of urine and blood samples for the commission since 1976. Dr. Sams authored and issued the standard operating procedures employed by the commission and provided testimony regarding his extensive background in the field of equine analytical toxicology. The *Page 9 
hearing examiner determined that Dr. Sams was qualified as an expert regarding the testing performed on the sample taken from Country Welcome, and also found Dr. Sams was the custodian of records who could testify as to the results of said testing. Dr. Sams also provided testimony regarding various documents, as well as physical evidence, which were generated by and/or used in connection with the testing of Country Welcome's sample.
 {¶ 19} Appellant argues that the commission did not establish that the sample was properly stored, transported or tested, nor did the commission prove that the equipment used to perform the testing was properly calibrated. Appellant also contends that because Dr. Sams was not personally involved with the collection, storage, transportation and testing of the sample taken from Country Welcome, his testimony was, in essence, inadmissible hearsay. These arguments are analogous to those asserted by criminal defendants who challenge the results of BAC testing upon being charged with driving while intoxicated. However, as previously stated, we agree with the court in Thomas I that the proceedings before the commission was not quasi-criminal in nature. Thus, contrary to appellant's position, he is not entitled to the same protections as those afforded to criminal defendants.
 {¶ 20} Further, this court has previously resolved a challenge to Dr. Sam's ability to testify regarding the testing process of samples and the corollary results in favor of the commission. In Belcher v. OhioState Racing Comm., 10th Dist. No. 03AP-786, 2004-Ohio-1278, the appellant (a trainer) challenged the toxicology report as being inadmissible hearsay because Dr. Sams had no personal knowledge as to what occurred *Page 10 
during testing, did not qualify as custodian of records, and indicated he only "assumed" appropriate procedures were followed. This court rejected that argument, explaining:
 Administrative agencies are not strictly bound by rules of evidence. Even if the hearsay rule were strictly applied, Dr. Sams' testimony would qualify as an exception under Evid. R. 803(6), because he testified as to a report kept in the course of regularly conducted business, and appellant failed to present substantial credible evidence that the laboratory procedures utilized, and the results obtained, were not trustworthy. As a result, Dr. Sams was qualified to testify regarding the business record and did not need to have personally performed the lab work.
(Citations omitted.) Id. at ¶ 12. We reach the same result herein.
 {¶ 21} Based upon the foregoing, appellant has failed to show that the trial court abused its discretion in finding that the commission's order was supported by reliable, probative, and substantial evidence and was in accordance with law. Accordingly, appellant's first assignment of error is overruled.
 {¶ 22} Under the second assignment of error, appellant asserts the trial court erred in affirming the commission's imposition of a maximum penalty, and that the actions of the commission constituted a violation of equal protection. Appellant cites the fact that, within months of the alleged violation, the commission drastically modified its method of testing from post-race testing to pre-race testing. Appellant maintains that the commission's decision supports a less severe sanction.
 {¶ 23} In general, "[w]hen a complaining party alleges that a law that is fair on its face was applied unequally to those who are similarly situated, that party must establish intentional and purposeful discrimination in order to prove a denial of equal protection."Linden Med. Pharmacy, Inc. v. Ohio State Bd. of Pharmacy, 10th Dist. No. 02AP-1233, 2003-Ohio-6650, ¶ 16, citing Cahill v. Lewisburg (1992),79 Ohio App.3d 109, 116. *Page 11 
 {¶ 24} In the instant case, the fact that the rule in effect at the time of the alleged violation was later modified does not amount to a denial of equal protection to appellant. See Thomas I, at ¶ 26. Indeed, the commission treated appellant the same as all other trainers similarly situated on September 7, 2006, and there was no showing of intentional and purposeful discrimination or that the commission acted arbitrarily.
 {¶ 25} Appellant also challenges the imposition of the penalties imposed as too severe. However, such penalty was "within the range of sanctions permitted, and this court does not have the authority to modify that decision if the Commission's decision is supported by reliable, probative and substantial evidence and is supported by law."Roberson v. Ohio State Racing Comm., 10th Dist. No. 03AP-480,2004-Ohio-127, ¶ 20. Appellant's second assignment of error is without merit and is overruled.
 {¶ 26} Based upon the foregoing, appellant's first and second assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.
Judgment affirmed.
BROWN and TYACK, JJ., concur.
[1] A "milkshake" is when a horse is made to ingest, or has been injected with, alkaline substances, such as sodium bicarbonate. Such increases a horse's TCO2 level, which is thought to delay the build-up of lactic acid in the horse's system, which in turn delays the onset of fatigue when racing.
[2] According to the May 2008 edition of the International Agreement on Breeding, Racing and Wagering, published by the International Federation of Horseracing Authorities, a TCO2 level above 36 millimoles per liter is actionable. *Page 1