[Cite as *Huff v. Ohio State Racing Comm.*, 2016-Ohio-8336.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| J. Frederick Huff, Jr., | : | |
| Appellant-Appellant, | : | No. 15AP-586 |
| | | (C.P.C. No. 15CV-1225) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Ohio State Racing Commission, | : | |
| Appellee-Appellee. | : | |

---

D E C I S I O N

Rendered on December 22, 2016

---

**On brief:** *Graff & McGovern, LPA*, and *John A. Izzo*, for appellant. **Argued:** *John A. Izzo.*

**On brief:** *Michael DeWine*, Attorney General, and *Paul Kulwinski*, for appellee. **Argued:** *Paul Kulwinski.*

---

APPEAL from the Franklin County Court of Common Pleas

BROWN, J.

{¶ 1} Appellant, J. Frederick Huff, Jr., appeals from a judgment of the Franklin County Court of Common Pleas, in which the court granted summary judgment to appellee, the Ohio State Racing Commission ("commission"). For the following reasons, we affirm in part and reverse in part.

{¶ 2} Appellant is a licensed racehorse owner, driver, and trainer. On July 18, 2014, a racehorse, Bell Flower, finished first in the first race held at Scioto Downs in Columbus, Ohio. The purse for the race was $40,000, with $20,000 going to the winner of the race. Appellant was the trainer and part owner of Bell Flower, and appellant's wife, Barbara Huff ("Barbara"), was Bell Flower's groom for the race.

{¶ 3} After the race, appellant and Barbara took Bell Flower to the test barn for required post-race testing. Appellant helped Barbara remove the harness and bathe Bell

Flower and then left the test barn after approximately 10 to 20 minutes. The state veterinarian at Scioto Downs, Dr. Jennifer McQuinn, then drew Bell Flower's blood. Dr. McQuinn testified that she told Barbara the next blood draw would be at 8:10 p.m. (Tr. at 39.) Barbara testified that, while they were in the stall, Dr. McQuinn told her, "you're here an hour-and-a-half" and Barbara asked Renee Moss ("Moss"), the veterinarian assistant and urine catcher, whether Dr. McQuinn meant an hour and one-half total or an hour and one-half if Bell Flower does not urinate within that time. Barbara testified Moss replied, "as soon as we get the urine, you're good." (Tr. at 225.) Barbara then went to Dr. McQuinn's office and watched Dr. McQuinn seal Bell Flower's blood sample and then Barbara signed her name indicating that she had done so.

{¶ 4} Barbara waited in Bell Flower's stall until Bell Flower urinated and Moss had collected the urine specimen. Barbara then went to Dr. McQuinn's office, watched, and signed for the sealing of the urine sample. After sealing the urine, Moss testified she told Barbara "You're good to go until 8:10" and Dr. McQuinn repeated, "[y]our last blood draw is at 8:10." (Tr. at 96.) Barbara testified only she and Moss were in Dr. McQuinn's office to seal the urine sample and Barbara asked Moss if she was "good to go" and Moss replied, "yes." (Tr. at 228.) Barbara then left the test barn with Bell Flower.

{¶ 5} On July 31, 2014, the judges at Scioto Downs issued a ruling finding that appellant failed to have Bell Flower's total carbon dioxide ("TCO2")[1] tested 90 minutes after the conclusion of the race, in violation of the racing rules. The judges disqualified Bell Flower, placed her last in the race and ordered appellant to forfeit and return the purse. Appellant appealed to the commission.

{¶ 6} On October 20, 2014, a commission's hearing examiner held a hearing. On December 11, 2014, the hearing examiner issued a report and recommendation, finding that appellant had violated Ohio Adm.Code rules 3769-18-01, 3769-18-02, 3769-18-03, and R.C. 3769.091. The hearing examiner recommended disqualifying Bell Flower from her finishing place, and ordering appellant to return the purse money. Appellant filed objections.

---

[1] Carbon dioxide and bicarbonate are naturally occurring substances in horses. However, a mixture of sodium bicarbonate and other substances can be given to a horse to enhance its performance and result in increased levels of TCO2. *DelBianco v. Ohio State Racing Comm.*, 10th Dist. No. 01AP-395 (Oct. 16, 2001).

{¶ 7} At their January 21, 2015 meeting, the commission voted to deny appellant's appeal and approved the purse money forfeiture. Appellant requested a stenographic record of the proceedings, but the commission denied the request. On January 26, 2015, the commission issued an order adopting the hearing examiner's report and recommendation and directing that the purse won by Bell Flower be redistributed to others in the race. Appellant appealed the commission's order to the Franklin County Court of Common Pleas. On May 27, 2015, the common pleas court issued a judgment affirming the commission's order. Appellant appeals the judgment of the common pleas court, asserting the following assignments of error:

> [I.] The lower court abused its discretion when it denied Mr. Huff's motion for a finding in his favor when the commission failed to file a complete record of the proceedings.
>
> [II.] The lower court abused its discretion when it determined the commission order was in accordance with law and that the commission did not enforce an unpromulgated rule.
>
> [III.] The lower court abused its discretion when it determined the commission order was based on reliable, probative, and substantial evidence despite the hearing examiner's multiple inaccurate statements in his report to Mr. Huff's detriment.
>
> [IV.] The lower court abused its discretion when it determined Mr. Huff's due process rights were not violated.
>
> [V.] The lower court abused its discretion when it determined the commission order was in accordance with law finding Mr. Huff was in violation of rules 3769-18-01, 3769-18-02, and 3769-18-03.
>
> [VI.] The lower court abused its discretion when it determined the commission order was in accordance with law despite the commission not considering the objections.
>
> [VII.] The lower court abused its discretion when it determined the commission order was based upon reliable, probate, and substantial evidence despite the hearing examiner incorrectly determining the veterinarian's and vet assistant's testimonies were the most persuasive.

[VIII.] The lower court abused its discretion when it determined the commission order was based upon reliable, probative, and substantial evidence and was otherwise in accordance with law despite the hearing examiner keeping vital information from the commission by failing to recount witness testimony that did not support the hearing examiner's theory of the case.

{¶ 8} At the outset, we note the applicable standards of review for both the common pleas court and an appellate court in considering an administrative appeal under R.C. 119.12. In an administrative appeal, pursuant to R.C. 119.12, a common pleas court must consider the entire record to determine whether reliable, probative, and substantial evidence supports the agency's order and whether the order is in accordance with law. *Univ. of Cincinnati v. Conrad*, 63 Ohio St.2d 108, 110 (1980). The common pleas court's "review of the administrative record is neither a trial *de novo* nor an appeal on questions of law only, but a hybrid review in which the court 'must appraise all the evidence as to the credibility of the witnesses, the probative character of the evidence, and the weight thereof.' " *Lies v. Veterinary Med. Bd.*, 2 Ohio App.3d 204, 207 (1st Dist.1981), quoting *Andrews v. Bd. of Liquor Control*, 164 Ohio St. 275, 280 (1955). The common pleas court "must give due deference to the administrative resolution of evidentiary conflicts," but "the findings of the agency are by no means conclusive." *Conrad* at 111.

{¶ 9} The Supreme Court of Ohio has defined reliable, probative, and substantial evidence as follows:

(1) "Reliable" evidence is dependable; that is, it can be confidently trusted. In order to be reliable, there must be a reasonable probability that the evidence is true. (2) "Probative" evidence is evidence that tends to prove the issue in question; it must be relevant in determining the issue. (3) "Substantial" evidence is evidence with some weight; it must have importance and value.

*Our Place, Inc. v. Ohio Liquor Control Comm.*, 63 Ohio St.3d 570, 571 (1992).

{¶ 10} On questions of law, the common pleas court conducts a de novo review, exercising its independent judgment whether the administrative order is "in accordance with law." *Ohio Historical Soc. v. State Emp. Relations Bd.*, 66 Ohio St.3d 466, 471 (1993).

{¶ 11} An appellate court's review of an administrative decision is more limited in that the appellate court is to determine only whether the common pleas court abused its discretion. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993). The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). However, on review of purely legal questions, an appellate court conducts a de novo review. *Big Bob's, Inc. v. Ohio Liquor Control Comm.*, 151 Ohio App.3d 498, 2003-Ohio-418, ¶ 15 (10th Dist.).

{¶ 12} Appellant argues in his first assignment of error that the common pleas court abused its discretion when it denied his motion for a finding in his favor when the commission failed to file a complete record of the proceedings. Appellant filed a motion seeking a judgment in his favor arguing that the commission intentionally failed to file a timely record of the proceedings in the administrative case.

{¶ 13} Appellant argued in his motion that the commission failed to file a complete record because the record did not contain a stenographic recording or transcript of the January 21, 2015 meeting where the commission adopted the hearing examiner's recommendations.

{¶ 14} R.C. 119.12(I) provides, as follows:

> Within thirty days after receipt of a notice of appeal from an order in any case in which a hearing is required by sections 119.01 to 119.13 of the Revised Code, the agency shall prepare and certify to the court a complete record of the proceedings in the case. Failure of the agency to comply within the time allowed, upon motion, shall cause the court to enter a finding in favor of the party adversely affected.

{¶ 15} This provision in R.C. 119.12 is mandatory. *Checker Realty Co. v. Ohio Real Estate Comm.*, 41 Ohio App.2d 37, 39 (10th Dist.1974).

{¶ 16} The court in *Checker*, defined a "complete record of proceedings" as "[a] 'precise history' of the administrative proceedings from their commencement to their termination." *Id.* at 42. A complete record of the proceedings includes more than a transcript of the testimony offered and the evidence submitted at the hearing. *Id.* at 41. The court determined that the record must contain "that which commenced the case," (whether a verified complaint or a motion), the required notice under R.C. 119.07, any

orders issued, the agency's order, and proof of proper service. *Id.* at 42-43. Further, other courts have included in the definition of "complete record" the minutes of the board meeting approving the order and a transcript of the R.C. 119.12 hearing. *Bergdahl v. State Bd. of Psychology*, 70 Ohio App.3d 488, 491 (4th Dist.1990); *Stephan v. State Veterinary Med. Bd.*, 113 Ohio App. 538 (1st Dist.1960).

{¶ 17} Appellant argues that R.C. 119.09 required the commission to obtain a stenographic record of the commission meeting adopting the hearing examiner's recommendation.   R.C. 119.09 provides that at an R.C. 119.01 to 119.13 hearing, the agency shall provide a stenographic record of the testimony and other evidence at its expense ("At any adjudication hearing required by sections 119.01 to 119.13 of the Revised Code, the record of which may be the basis of an appeal to court, a stenographic record of the testimony and other evidence submitted shall be taken at the expense of the agency."). However, the statute does not require a transcript of meetings where deliberations occur. *Tresville v. Bd. of Registration for Professional Engineers & Surveyors*, 8th Dist. No. 37781 (Jan. 11, 1979).   In *Tresville*, the court found that R.C. 119.12 requires a complete record of the proceedings, which includes a transcript of the hearing, but does not require a transcript of meetings where deliberations occur. In *Beach v. Ohio Bd. of Nursing*, 10th Dist. No. 10AP-940, 2011-Ohio-3451, ¶ 23, this court found that the failure by the Board of Nursing to transcribe the deliberations at the meeting did not require a judgment in the appellant's favor.  Thus, here, the commission did not fail to file a complete record of the proceedings and the common pleas court properly denied appellant's motion for judgment.  Appellant's first assignment of error is overruled.

{¶ 18} In his second assignment of error, appellant argues that the common pleas court abused its discretion when it determined the commission's order was in accordance with law and that the commission did not enforce an unpromulgated rule.

{¶ 19} Prior to January 1, 2014, blood draws for TCO2 testing were performed pre-race. (Tr. at 126-27.)  However, on December 6, 2013, William Crawford ("Crawford"), Executive Director of the commission, wrote exhibit J, addressed to horsemen, the Ohio Horsemen's Benevolent and Protective Association ("OHBPA") and the Ohio Harness Horsemen Association ("OHHA"), Standardbred Judges, Thoroughbred Stewards, Racetrack General Managers, and state Veterinarians.  Exhibit J changed the standard

operating procedures for TCO2 testing by requiring the blood sample to be taken post-race. The winning horse and a "horse that has a special by the judges or stewards" were now required to remain in the testing barn for one and one-half hours after the race, along with a representative. Only the state veterinarian will release horses after the specified time.

{¶ 20} Crawford testified that he distributed exhibit J by mail and e-mail. It was posted on the commission's website, the OHHA's website, and the veterinarians were instructed to post it in the test barns. (Tr. at 177.) Dr. McQuinn testified that she posted a copy of exhibit J on her office door in the test barn and two dry erase boards were in the test barn listing the blood draw times for each horse. Moss confirmed this. Dr. McQuinn also testified that TCO2 requires a second blood draw because the testing procedure is different from the other samples. Barbara testified she did not see any notice regarding exhibit J inside the barn that evening, but she also testified she was focused on Bell Flower and "barely even take[s] [her] eyes off the horse." (Tr. at 226-27.)

{¶ 21} Appellant contends that this change in standard operating procedure for TCO2 testing constituted an unpromulgated rule and the commission could not enforce it against him. The commission contends that the change constituted a guideline, not a rule. The parties stipulated that exhibit J was not promulgated through R.C. Chapter 119 rule procedures.

{¶ 22} R.C. Chapter 3769 provides the enabling legislation for horseracing. R.C. 3769.02 establishes the commission, while R.C. 3769.03 empowers the commission to "prescribe the rules and conditions under which horse racing may be conducted." "Horse racing and legalized wagering thereon, are subjects with respect to which police regulations for the protection of the public safety, morals, and general welfare, are not only proper but are an absolute necessity." *Standard "Tote" Inc. v. Ohio State Racing Comm.*, 68 Ohio Law Abs. 19, 25 (1954). The very nature of horse racing itself presents numerous opportunities for abuse, thus, specific and strict rules are necessary in order to preserve the integrity of the sport. *Haehn v. Ohio State Racing Comm.*, 83 Ohio App.3d 208, 213 (10th Dist.1992).

{¶ 23} The legislature has defined "rule," but not "guideline." R.C. 119.01(C) defines a rule as "any rule, regulation, or standard having a general and uniform

operation, adopted, promulgated, and enforced by any agency under the authority of the laws governing such agency. Rule does not include any internal management rule of an agency unless the internal management rule affects private rights."

{¶ 24} R.C. 119.03 provides certain procedures that an agency must comply with in order to adopt rules. R.C. 119.02 provides that the failure of any agency to comply with the proper procedures shall invalidate any rule adopted by the agency. " ' "It is the effect of the [document], not how the [agency] chooses to characterize it," ' that determines whether a document issued from an agency constitutes a rule." *Ohio Podiatric Med. Assn. v. Taylor*, 10th Dist. No. 11AP-916, 2012-Ohio-2732, ¶ 35, quoting *State ex rel. Saunders v. Indus. Comm.*, 101 Ohio St.3d 125, 2004-Ohio-339, ¶ 26, quoting *Ohio Nurses Assn., Inc. v. Ohio State Bd. of Nursing Edn. & Nurse Registration*, 44 Ohio St.3d 73, 76 (1989). "The pivotal issue in determining the effect of a document is whether it enlarges the scope of the rule or statute from which it derives rather than simply interprets it." *Id.*, quoting *Saunders* at ¶ 27, citing *Ohio Nurses*; *Opus Iii-Vii Corp. v. Ohio State Bd. of Pharmacy*, 109 Ohio App.3d 102, 112 (10th Dist.1996). " 'If the former, it must be promulgated pursuant to R.C. Chapter 119. If the latter, it is exempt from those requirements.' " *Taylor* at ¶ 35, quoting *Saunders* at ¶ 27.

{¶ 25} In this case, exhibit J does not enlarge the scope of the rules but, rather, interprets the rules that already existed. Ohio Adm.Code 3769-18-01(B)(4)(d) and 3769-18-01(B)(19)(a) provide that TCO2 is a substance that must be tested by the commission. Ohio Adm.Code 3769-18-01(B)(14) requires the winning horse to report to the state testing barn. Ohio Adm.Code 3769-18-03(A) requires a representative to remain with the horse when the samples are taken. Ohio Adm.Code 3769-18-02(A) provides that "horses shall remain in the state testing barn area until required specimens have been obtained by the veterinarian and until he shall have released said horses." It is undisputed that appellant did not present Bell Flower for full and complete post-race testing procedures. Further, the state veterinarian, Dr. McQuinn, testified she did not release Bell Flower before Barbara removed Bell Flower from the state testing barn.

{¶ 26} In *Thomas v. Ohio State Racing Comm.*, 10th Dist. No. 08AP-459, 2008-Ohio-6965 ("*Thomas I*"), this court affirmed the common pleas court after it affirmed an order of the commission finding Terry Thomas in violation of the commission's horse

racing rules after his horse tested for a level of TCO2 in excess of the threshold amount. Thomas was the trainer of the horse and, therefore, the absolute insurer of the condition of the horse under Ohio Adm.Code 3769-18-02.[2]

{¶ 27} In *Thomas I* and *Thomas v. Ohio State Racing Comm.*, 10th Dist. No. 08AP-804, 2009-Ohio-1559 ("*Thomas II*"), Thomas argued that within months of the alleged violation, the commission modified its method of testing from post-race testing to pre-race testing. This court found no equal protection violation because Thomas was treated the same as similarly situated trainers and there was no evidence of intentional or purposeful discrimination.

{¶ 28} Thomas also argued in *Thomas II* that the commission exceeded its rule-making authority by establishing a TCO2 level above 37 millimoles per liter as a foreign substance. This court overruled that argument finding that Ohio Adm.Code 3769-18-01(A)(2) provides the authority for the commission to establish methods and detection levels for prohibited substances.

{¶ 29} Prior to the Ohio Administrative Code specifying that TCO2 levels above 37 millimoles per liter constituted a foreign substance, this court determined the commission must establish by rule a standard regarding prohibited TCO2 concentrations. *DelBianco*. As recognized in *DelBianco v. Ohio State Racing Comm.*, 10th Dist. No. 01AP-395 (Oct. 16, 2001), in July 1999, subsequent to the alleged violation in *DelBianco*, the administrative code did not provide a standard for TCO2 levels as a foreign substance. However, the administrative code provides that the commission could establish methods and detection levels for prohibited foreign substances. Currently, Ohio Adm.Code 3769-18-01(A)(2) permits the commission to establish a system of classification, as follows:

> The commission may, *by order*, establish a system of classification of prohibited foreign substances, to include methods of detection and/or regulatory thresholds thereof * * *.

(Emphasis added.)

---

[2] Ohio Adm.Code 3769-18-02, or the absolute insurer rule is constitutional. This rule imposes liability, without fault, on a trainer of record for the condition of the horse. *Sahely v. Ohio State Racing Comm.*, 10th Dist. No. 92AP-1430 (Apr. 6, 1993), citing *O'Daniel v. Ohio State Racing Comm.*, 37 Ohio St.2d 87 (1974).

{¶ 30} Here, the commission requires horses to report to the state testing barn and be tested for foreign substances. The commission established that TCO2 levels above 37 millimoles constitutes a foreign substance. The commission has used standard operating procedures of both pre-race and post-race testing. These are methods enforcing the rules that already exist. Prior to late 2006, the testing occurred post-race. In late 2006, the commission commenced pre-race testing for TCO2. *Thomas I* at ¶ 26. Beginning January 1, 2014, testing for TCO2 was once again performed post-race. (Tr. at 126-27.) In *Thomas I* and *II*, Thomas argued an equal protection violation occurred because within months of the violation, the commission modified its method of testing from post-race to pre-race testing. This court found no equal protection violation because Thomas was treated the same as similarly situated trainers and there was no evidence of intentional or purposeful discrimination.

{¶ 31} We find the common pleas court did not err when it determined the commission's order was in accordance with law and that the commission did not enforce a rule that had not been properly promulgated. Appellant's second assignment of error is overruled.

{¶ 32} Appellant argues in his third assignment of error that the common pleas court abused its discretion when it determined the commission's order was based on reliable, probative, and substantial evidence despite the hearing examiner's multiple inaccurate statements in his report. Appellant contends that the hearing examiner's report contains 20 inaccuracies that prejudiced appellant and that the report cannot be reliable with such a large number of inaccuracies.

{¶ 33} The inaccuracies from the hearing examiner's report that appellant contends render the report unreliable, are as follows:

> 1. The hearing examiner is incorrect that Mr. Huff is a licensed "trotter owner/driver/trainer." *See* Report at 1. No limitation was discussed at the hearing, nor is indicated on his application. *See* Exhibit E.
>
> 2. The Scioto Downs Ohio Sires Stakes for 2 year old fillies did not take place in Grove City, Ohio, as indicated by the hearing examiner. *See* Report at 1. Exhibit G, which the hearing officer cites as his authority for this statement, makes no mention of Grove City. Scioto Downs is in Columbus, Ohio.

3. The hearing examiner is incorrect Exhibit I indicates what the judges found. *See* Report at 1. The parties stipulated as to what the judges' ruling covered and what must be proved at the *de novo* hearing. Tr. at 13-14.

4. The hearing examiner is incorrect that the judges' ruling held that Mr. Huff's horse failed to submit for proper post-race testing, as required by the OSRC rules. *See* Report at 1. In fact, the judges found Mr. Huff did not comply with the Commission's post-race testing procedures. Tr. at 13-14. There is a big difference between a rules violation and a policy violation.

5. The hearing examiner is incorrect that Barbara Roth [sic] testified at the hearing. *See* Report at 2 and 3. Ms. Roth did not testify. *See* Tr. at 3. The hearing examiner created testimony for Ms. Roth. Report at 3. This is more than a mere "scrivener's error." This is the hearing examiner's inability to write a fair and reliable report.

6. The hearing examiner is incorrect that Dr. McQuinn sent an investigator to check for the horse to determine its whereabouts. *See* Report at 4. In fact, she called Randy Lane, whose title she doesn't know. Tr. at 137. She does not know what Mr. Lane did after she called him. *Id.* The Report is unreliable.

7. The hearing examiner is incorrect that Ms. Moss is a former vet assistant, or a technician. *See* Report at 4. Ms. Moss stated she is unemployed but worked as a veterinary assistant at Scioto Downs. Tr. at 67-68.

8. The hearing examiner created testimony from Ms. Moss, stating she uses a reflective stick for urine measurement. *See* Report at 5. In fact, Ms. Moss makes no mention of a reflective stick, but only of a stick that she put the collection cup in. Tr. at 71. This is yet another example of the unreliable information contained in the Report.

9. The hearing examiner created testimony when he stated that Ms. Moss called upon Randy Lane. *See* Report at 5. Ms. Moss never mentioned in her testimony that she contacted Mr. Lane. She stated only that she told Dr. McQuinn that BELL FLOWER was no longer in the testbarn. Tr. at 111.

10. The hearing examiner is wrong that Crawford was called out of order. *See* Report at 6. Crawford was called by Mr. Huff and not out of order.

11. The hearing examiner incorrectly stated Crawford sent Exhibit J by regular mail and e-mail to affected parties described. *Id.* In fact, Crawford stated he did not send Exhibit J to the horsemen by regular mail or e-mail. Tr. at 176. This is important because the hearing examiner left the impression that Crawford notified all affected parties of the significant change in the testing procedure, and he did not. This prejudiced Mr. Huff before the Commission.

12. The hearing officer is incorrect that Crawford said a groom is given the opportunity to request a split for TCO2 testing. *See* Report at 6. In fact, Crawford specifically stated that the Commission does not authorize splits for TCO2 testing. Tr. at 179. The hearing examiner was not listening to the testimony being presented.

13. Crawford never described Exhibit J as an "Executive Order." *See* Report at 6. Crawford only referred to it as a directive. The hearing examiner changed the descriptive term of the exhibit to the detriment of Mr. Huff. The Report is unreliable.

14. The state did not rest after Crawford's testimony. *See* Report at 7. In fact, it rested after the testimony of Dr. McQuinn and Ms. Moss. Tr. at 117. The hearing examiner paid no attention to what occurred at the hearing.

15. Mr. Fairchild does not have "some difficult[y] hearing." *See* Report at 7. In fact, the uncontroverted testimony was that he had no hearing problems and his doctors said his hearing was fine. Tr. at 211-212. The unreliable statement from the hearing examiner makes it easier to discredit his statements.

16. Mrs. Huff did not wash the stall in the testbarn. *See* Report at 7. In fact, she testified that she took the horse to the wash stall. Tr. at 21. This unreliable information is nonsensical.

17. Mrs. Huff did not throw "her hands up to no one in particular" and leave the testbarn. *See* Report at 8. In fact, she directed her gesture to Dr. McQuinn and other collectors. Tr. at 229. This unreliable information made the Commission

believe that Mrs. Huff snuck out of the testbarn with the horse. In fact, Mrs. Huff acknowledged that she was leaving the testbarn and no one stopped her.

18. The hearing examiner incorrectly identifies Exhibit H as a picture and states Mrs. Huff could not say if the photos accurately depicted the testbarn on July 18, 2014. *See* Report at 8. In fact, she recalled certain items not being present when she was at the track. Tr. at 242-243.

19. Mr. Huff did not testify that, at Scioto Downs, blood is pulled once and the horse is sent back to the stall. *See* Report at 8. In fact, this was Mr. Huff's description of what happens at fairs. Tr. at 246, in reference to Circleville.

20. The hearing examiner refers to the lack of riding violations Mr. Huff has. *See* Report at 9. Mr. Huff does not ride horses, he drives horses as evidenced by his license application, Exhibit E. This is more unreliable information from the hearing examiner.

(Appellant's brief at 29-32.)

{¶ 34} Most of these inaccuracies contained in the hearing examiner's report are not essential to the issues to be decided in this case. For example, whether appellant is a licensed "trotter owner/driver/trainer" or a licensed owner/driver/trainer or whether Scioto Downs is located in Grove City or Columbus, Ohio are not determinative of the issues. "[W]here the extraneous information contained in the Report and Recommendation is not dispositive of the Commission's decision and does not affect appellant's substantial rights, the common pleas court does not err in affirming the Commission's order containing those extraneous statements." *Cowans v. Ohio State Racing Comm.*, 10th Dist. No. 13AP-828, 2014-Ohio-1811, ¶ 13, citing *Roy v. Ohio State Med. Bd.*, 80 Ohio App.3d 675, 686 (10th Dist.1992).

{¶ 35} One of appellant's complaints is that the hearing examiner stated that Barbara testified at the hearing. She was present at the hearing to testify regarding documents, but the parties stipulated to the admission of the documents so her testimony was unnecessary. Another issue was that the hearing examiner stated Ms. Moss called Randy Lane. However, Ms. Moss stated she informed Dr. McQuinn that Bell Flower was no longer in the test barn and Dr. McQuinn notified Lane that Barbara had left with Bell

Flower. Another example appellant cites is that the hearing examiner incorrectly stated William Crawford was called out of order when he was called by appellant. None of these inaccuracies by the hearing examiner are essential to the issues to be decided in this case.

{¶ 36} In *Cowans*, the appellant argued that the hearing examiner copied information from an entirely different case and erroneously included it in the report and recommendation; thus, the report and recommendation did not accurately reflect the evidence presented at the hearing and it should not have been relied on by the commission. The appellant also argued that the report and recommendation contained so many inaccuracies that reliable, probative, and substantial evidence did not support the commission's order. This court, in *Cowans*, stated that absent a showing that the commission relied on the allegedly erroneous portion of the report and recommendation, any errors in the report and recommendation were harmless. Furthermore, even if the report contains inaccuracies, "the Commission 'has extensive authority to review and resolve independently evidentiary conflicts in the record.' " *Cowans* at ¶ 15, quoting *Bharmota v. State Med. Bd. of Ohio*, 10th Dist. No. 93AP-630 (Dec. 7, 1993). Thus, this court must focus on whether the common pleas court abused its discretion in finding that the record contained enough reliable, probative, and substantial evidence to support the commission's order despite the alleged mistakes in the report and recommendation.

{¶ 37} Appellant admitted that Bell Flower left the state testing barn before the TCO2 blood draw. Dr. McQuinn testified that she posted a copy of exhibit J on her office door in the test barn and two dry erase boards were in the test barn listing the blood draw times for each horse. Moss confirmed this. Dr. McQuinn also testified she told Barbara she was in the barn for one and one-half hours and told her, "[y]our last blood draw is at 8:10." (Tr. at 96.) Despite the conflicting testimony regarding the exact language Moss used, she testified that she also told Barbara, "[y]ou're good to go until 8:10." (Tr. at 96.)[3] Further, Dr. McQuinn testified that she did not release Bell Flower or Barbara that evening. The common pleas court did not abuse its discretion in finding the record contained enough reliable, probative, and substantial evidence to support the commission's order despite the alleged mistakes in the report and recommendation. Appellant's third assignment of error is overruled.

---

[3] Barbara testified Moss told her, "you're good to go." (Tr. at 229.)

{¶ 38} Appellant argues in his fourth assignment of error that the common pleas court abused its discretion when it determined appellant's due process rights were not violated. Appellant argues he was not given notice that a violation of R.C. 3769.091 was before the hearing examiner. Yet, he was found to have violated this statute.

{¶ 39} R.C. 3769.091 provides, as follows:

> The state racing commission may delegate to the stewards and judges of racing meetings under the jurisdiction of the commission the power to suspend licenses for not to exceed one year and to impose fines not to exceed one thousand dollars for any violation of the rules or orders of the commission, provided that two of such officials shall concur in such suspension. Any suspension of a license by such officials is valid even though the suspension extends beyond the period of the racing meeting for which such officials have been appointed. The suspension shall be effective at all other race meetings under the jurisdiction of the commission. Any fine or suspension may be appealed to the commission. Such appeal shall stay the fine or suspension until further action by the commission.

{¶ 40} This statutory provision provides that the commission may delegate the authority for imposing fines and suspensions to stewards and judges. R.C. 3769.091 provides that in the event of any violation of the rules or orders of the commission, the stewards and racing judges may be given the authority to impose fines and suspensions. After review of the statute, there is nothing in this statute for appellant to have violated. If R.C. 3769.091 did contain a provision that could be violated, notice would have been necessary and due process would have been violated. However, since a violation could not be found here, notice was not necessary and, therefore, due process has not been denied. However, this error must be corrected on remand and the order modified to reflect no violation of R.C. 3769.091.

{¶ 41} Appellant further contends that he did not receive due process because he did not receive a meaningful hearing. "The fundamental requirement of procedural due process is notice and hearing, that is, an opportunity to be heard." *Korn v. Ohio Med. Bd.*, 61 Ohio App.3d 677, 684 (10th Dist.1988), citing *Luff v. State*, 117 Ohio St. 102 (1927).

{¶ 42} Appellant received notice and had an opportunity to be heard. He requested a hearing and was represented by counsel. He testified on his own behalf, and

conducted questioning of other witnesses at the hearing. He filed written objections and argued before the commission. His due process rights were not violated.

{¶ 43} Appellant argues the hearing examiner deprived him of a meaningful hearing by denying his request to view the testing barn, by denying the opportunity to present witnesses in the order appellant chose, and by asking witnesses questions.

{¶ 44} Appellant contends the hearing examiner denied him his due process rights by denying his motion to view the testing barn. An actual viewing was not necessary because admitted exhibits included photographs of the test barn. There was no testimony that the photographs did not accurately portray the testing barn. The burden is on an appellant to establish bias or impropriety. An appellant must demonstrate specific bias or prejudice to establish a violation of due process and overcome the presumption that the administrative agency's determination is valid. *Althof v. Ohio State Bd. of Psychology,* 10th Dist. No. 05AP-1169, 2007-Ohio-1010, ¶ 32-33.

{¶ 45} Appellant also contends he was denied due process because the hearing examiner denied him the opportunity to present witnesses in the order he chose. We have reviewed the entire transcript. Appellant's characterization of the hearing is not quite accurate. The hearing examiner attempted to conserve time, but did not deny him the opportunity to present witnesses in his chosen order.

{¶ 46} Appellant also argues the hearing examiner could not ask questions because he was the trier of fact. There is no rule prohibiting a hearing examiner from asking questions of witnesses to clarify testimony. In *A-1 Natl. Agency Group, LLC No. 1167 v. Dept. of Ins.,* 3d Dist. No. 15-04-01, 2004-Ohio-3553, the appellants argued they were denied a fair hearing in violation of their due process rights because the hearing officer questioned a witness on matters not contained in the notice of administrative hearing. However, the Third District found that the common pleas court did not abuse its discretion in holding that appellants received a fair hearing. The court found that the hearing officer's questions were relevant to the proceedings. In this case, the hearing examiner also asked relevant questions and did not deny appellant a fair hearing by doing so.

{¶ 47} Finally, appellant cites the hearing examiner's questioning of his witness John Fairchild as an example of the lack of meaningful hearing. Upon questioning by the

hearing examiner, Fairchild explained that he has some hearing loss from working in the construction industry for 30 years. The hearing examiner concluded that Fairchild had "some difficulty hearing." (Report and Recommendation at 13.) However, despite the fact that Fairchild was part owner of the horse and present at Scioto Downs on July 18, 2014, Fairchild was not in the testing barn when Bell Flower was present. Thus, Fairchild was not privy to any of the conversations that occurred. His hearing has no bearing on the ultimate issues in this case. Appellant's fourth assignment of error is overruled.

{¶ 48} Appellant argues in his fifth assignment of error that the common pleas court abused its discretion when it determined the commission's order was in accordance with law finding he was in violation of Ohio Adm.Code 3769-18-01, 3769-18-02, and 3769-18-03. Appellant contends because there was no positive finding of a foreign substance in Bell Flower, there was no violation of Ohio Adm.Code 3769-18-01. Ohio Adm.Code 3769-18-01 provides, in pertinent part, as follows:

> (A)(2) "Foreign substances" shall mean all classified substances except those which exist naturally in the untreated horse at normal physiological concentrations and include all narcotics, stimulants, depressants or other drugs. The commission may, by order, establish a system of classification of prohibited foreign substances, to include methods of detection and/or regulatory thresholds thereof, recommended penalties and disciplinary measures for the presence of said substances in test samples. In determining the substances to be so classified, the commission shall give due consideration to the uniform classification guidelines of foreign substances and recommended penalties and model rules as revised from time to time by the association of racing commissioners international inc.
>
> * * *
>
> (B)(4) It shall be deemed a violation of this rule:
>
> * * *
>
> (d) Should a test sample of blood taken from a horse show a concentration of total carbon dioxide in the plasma and/or serum in excess of thirty-seven millimoles per liter; or
>
> * * *

(14)  It shall be the responsibility of the trainer of the winning horse or any other horse from which the judges order a test sample to be taken, to see that horse is taken directly after the race to the state testing barn at a commercial track * * *.

{¶ 49}  The language of the rule states that a violation of Ohio Adm.Code 3769-18-01(B)(4)(d) occurs when a blood sample taken from a horse shows a concentration of TCO2 in the plasma and/or serum in excess of 37 millimoles per liter.  Here, there was no test sample so we cannot find there was a violation of this rule.

{¶ 50} Appellant also argues there is no violation of Ohio Adm.Code 3769-18-02(A) since there was no chemical test that proved positive. Ohio Adm.Code 3769-18-02(A) is known as the trainer responsibility rule, or absolute insurer rule and provides, as follows:

The trainer shall be the absolute insurer of, and responsible for, the condition of the horse entered in a race, regardless of the acts of third parties.  Should the chemical or other analysis of urine or blood specimens prove positive, showing the presence of any foreign substance not permitted by rule 3769-18-01 of the Administrative Code, the trainer of the horse, the foreman in charge of the horse, the groom, and any other person shown to have had the care or attendance of the horse may, in the discretion of the commission, be subjected to penalties provided in paragraph (B) of this rule. Permit holders, other than county or independent fairs, shall provide and maintain a state testing area to include a group of stalls for the accommodation of the horses as are designated in rule 3769-18-01 of the Administrative Code, and such horses shall remain in the state testing barn area until required specimens have been obtained by the veterinarian and until he shall have released said horses. All persons shall be excluded from said area except owners, trainers, or their representatives, horses from which the specimens are taken, the authorized veterinarian and his assistants and any representative of the commission.

{¶ 51}  Appellant argues that this rule applies only to the strict liability of trainers whose horses test positive.  However, appellant ignores the language of the rule requiring the horses to "remain in the state testing barn area until required specimens have been obtained by the veterinarian and until he shall have released said horses."  Bell Flower did

not remain in the testing area until all the required specimens were obtained and the veterinarian did not release Bell Flower.

{¶ 52} Finally, appellant argues that the mere failure to have a horse present at testing is not a violation of Ohio Adm.Code 3769-18-03(A). Ohio Adm.Code 3769-18-03(A) provides, as follows:

> The owner, trainer, groom or other representative must be present in the state testing barn when a test sample is taken from the horse, and must remain until the test sample is sealed. The official tag attached to a test sample shall be signed by the owner, trainer, groom or other representative as witness to the taking of such test sample. Willful failure to be present at, or a refusal to allow, or any act or threat to impede or prevent or otherwise interfere with, the taking of any such test sample shall subject the licensee guilty thereof to immediate suspension by the judges, and the matter shall be referred to the commission for its consideration.

{¶ 53} The language of this rule does not require a willful failure to be present at the testing, but merely "a refusal to allow, or any act * * * to impede or prevent or otherwise interfere with, the taking of any such test sample shall subject the licensee guilty thereof to immediate suspension by the judges." The uncontested facts provide that Barbara removed Bell Flower from the state testing barn prior to the taking of all test samples and prior to the veterinarian releasing Bell Flower.

{¶ 54} Appellant faults the common pleas court for citing *Quesenberry v. Ohio State Racing Comm.*, 11th Dist. No. 1576 (Dec. 20, 1985). In *Quesenberry*, the groom removed the horse from the state testing barn before the veterinarian took the required blood specimen. As a result, the blood specimen was taken at the horse's stable and neither the jockey nor the groom were present when the specimen packet was sealed. The blood sample was found to be tainted which violated Ohio Adm.Code 3769-18-01(B)(1)(a). The Eleventh District determined that it was the groom's fault that the jockey's horse was not at the proper place for the drawing of the blood sample and for that reason no one witnessed the drawing of the blood sample or the signing of the official tags. Thus, the appellant waived his right to complain about his failure to witness the sealing of the specimen. In this case, the common pleas court cited *Quesenberry* for the proposition that the failure to have a horse present at the state testing barn was sufficient

for a violation of Ohio Adm.Code 3769-18-03. *Quesenberry* does conclude that when the horse is not in the proper place for testing and the specimen is in violation, the party waives its right to complain about the gathering of the specimen. Here, there is no question that Barbara's actions impeded or prevented the taking of the test sample. That violation subjects the licensee to sanctions. Ohio Adm.Code 3769-18-03(A). Appellant's fifth assignment of error is sustained in part and overruled in part.

{¶ 55} Appellant argues in his sixth assignment of error that the common pleas court abused its discretion when it determined the commission's order was in accordance with law despite the commission's failing to consider the objections. Appellant filed his objections on January 12, 2015 and the commission considered the hearing examiner's report and recommendation on January 21, 2015. Appellant argues that because the commission did not modify the report, it is clear the commissioners did not read the objections because they would have realized that the report is not based on reliable, probative, and substantial evidence. Further, appellant contends that since the commission's meeting minutes do not state that the objections were overruled, they were not.

{¶ 56} Appellant did not affirmatively demonstrate that the commission failed to consider the transcript, exhibits, and issues involved in his case. Where the record is silent, courts must presume the commission reviewed an appellant's objections before adopting the hearing examiner's report and recommendation in the absence of an affirmative showing to the contrary. *Perry v. Joseph*, 10th Dist. No. 07AP-359, 2008-Ohio-1107, ¶ 20, citing *In re Herman*, 2d Dist. No. 94 CA 12 (Jan. 27, 1995) (in the absence of an affirmative showing that the trial court did not consider the record before overruling objections and adopting the magistrate's recommendation, the appellate court presumes the trial court acted as required). *See also Cowans* at ¶ 40, where the court held that without an affirmative showing that the administrative body failed to consider the objections, an appellate court presumes regularity. The *Cowans* court recognized that there is no authority requiring an administrative body to state on the record that it considered the objections. *Id.* at ¶ 39. Appellant's sixth assignment of error is overruled.

{¶ 57} Appellant argues in his seventh assignment of error that the common pleas court abused its discretion when it determined the commission's order was based on

reliable, probative, and substantial evidence despite the hearing examiner's incorrect determination that the testimonies of the veterinarian and the veterinarian assistant were the most persuasive. Appellant argues that given the many mistakes in the report and recommendation, the commission should not have relied on the hearing examiner's determinations of credibility. Appellant contends that since Dr. McQuinn and Moss were not truthful in their testimonies and their testimonies conflicted with Fairchild's testimony, the hearing examiner should not have relied on their testimonies.

{¶ 58} The hearing examiner stated that Dr. McQuinn and Moss were more persuasive. However, appellant argues that since the hearing examiner did not state the other witnesses were less credible, one must conclude that all the witnesses' testimonies were equally credible and the hearing examiner should not have ruled against appellant.

{¶ 59} The hearing examiner explicitly found as follows: "[I]n weighing the witness testimony, the documents presented, and after reviewing the documents and evidence submitted, finds that the veterinarian's and vet assistants testimonies are the most persuasive, and that the groom's explanation does not warrant a dismissal of the charges against the trainer. Nor does the Hearing Officer find her version to be exonerating." (Report and Recommendation at 19.) This conclusion does not find all the witnesses' testimonies equally credible. The hearing examiner explicitly found the veterinarian and veterinarian assistant's testimonies more persuasive and Barbara's explanation not persuasive.

{¶ 60} An appellate court must give great deference to the fact finder's determination of witnesses' credibility. *State v. Wright*, 10th Dist. No. 03AP-470, 2004-Ohio-677, ¶ 11. The underlying policy of this presumption is that the trier of fact is in the best position to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony. Here, the magistrate, as the trier of fact, was in the best position to judge the credibility of the witnesses. We have already determined that the mistakes in the report and recommendation were not crucial to the ultimate determination. We do not find any "legally significant reasons for discrediting certain evidence relied upon by the administrative body" such that the common pleas court should have reversed, vacated or modified the administrative order. *Conrad* at 111. The Supreme Court discussed prior

precedent and stated, "[w]e take this precedent to mean that an agency's findings of fact are presumed to be correct and must be deferred to by a reviewing court unless that court determines that the agency's findings are internally inconsistent, impeached by evidence of a prior inconsistent statement, rest upon improper inferences, or are otherwise unsupportable." *Ohio Historical Soc.*, at 471, citing *Conrad* at 111-12. We find the common pleas court did not abuse its discretion in affirming the commission's order because the agency's findings were not internally inconsistent, impeached by evidence of a prior inconsistent statement, rest upon improper inferences, or are otherwise unsupportable. Appellant's seventh assignment of error is overruled.

{¶ 61} Appellant argues in his eighth assignment of error that the common pleas court abused its discretion when it determined the commission's order was based on reliable, probative, and substantial evidence and was otherwise in accordance with law despite the hearing examiner withholding vital information from the commission by failing to recount witness testimony that did not support the hearing examiner's theory of the case.

{¶ 62} Appellant contends that the hearing examiner kept the following information from the commission by failing to include it in his report:

> 1. Dr. McQuinn tells horsemen they are good to go when released from the testbarn. Tr. at 32 and 56.
>
> 2. Dr. McQuinn heard Ms. Moss tell Mrs. Huff that she was good to go ... until 8:10. Tr. at 96.
>
> 3. Ms. Moss told Mrs. Huff that she was good to go, but Dr. McQuinn doesn't believe Ms. Moss has the authority to release her from the testbarn. Tr. at 142. Of course Ms. Moss has the authority; she is Dr. McQuinn's assistant.
>
> 4. Ms. Moss could not explain the size of the testbarn. Tr. at 84. Surely a view of the testbarn was in order by either the hearing examiner or the Commission itself.
>
> 5. Mr. Fairchild stated he did not see any signs informing the horsemen about the ninety minute wait for TCO2 blood collection. Tr. at 194-195, 198.

(Appellant's brief at 54.)

{¶ 63} Appellant argues that this information is vital in order to explain why Bell Flower did not have blood drawn for the TCO2 testing. We determined that the commission was not required to specify in the rules that testing was moved to post-race. The commission determined that Bell Flower did not remain in the test barn until the veterinarian and her assistant took all the samples for testing. Additionally, the commission determined the veterinarian did not release Bell Flower from the state testing barn that night. We do not find error in failing to include the additional information in the report. Appellant received due process throughout the proceedings. The common pleas court did not abuse its discretion in affirming the order of the commission. Appellant's eighth assignment of error is overruled.

{¶ 64} Accordingly, appellant's first, second, third, sixth, seventh, and eighth assignments of error are overruled, and appellant's fourth assignment of error is overruled however, the final order cannot reflect a violation of R.C. 3769.091. The fifth assignment of error is sustained in part only as to Ohio Adm.Code 3769-18-01 and overruled in part. The judgment of the Franklin County Court of Common Pleas is affirmed in part and reversed in part, and this case is remanded to the commission for further proceedings in accordance with law, consistent with this decision.

*Judgment affirmed in part*
*and reversed in part;*
*case remanded.*

TYACK and SADLER, JJ., concur.

_____